UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Jacinda Gardner, on behalf of herself and all others similarly situated, | ) ) ) | Civil Action No.: 4:13-cv-03399-BHH |
| | ) | |
| Plaintiff, | ) | **Opinion and Order** |
| vs. | ) | |
| | ) | |
| Country Club, Inc. d/b/a Masters Gentlemen's Club, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter and a related case, *Degidio v. Crazy Horse Saloon* ("*Degidio*"), 4:13-2136-BHH, were presented to the Court on August 18, 2015, for hearing on motions for summary judgment, motions for conditional class certification and judicial notice pursuant to 216(b) of the FLSA, and motions for class certification under Rule 23. On September 30, 2015, the Court issued an exhaustive order in *Degidio* granting the motion for conditional class certification and judicial notice, denying the motion for class certification under Rule 23, and denying in substantial part the defendant's motion for summary judgment. *See Degidio v. Crazy Horse Saloon and Rest., Inc*, 4:13-cv-02136-BHH, 2015 WL 5834280 (D.S.C. Sept. 30, 2015). As the Court explained in its order, the material facts in the *Degidio* case were similar to those in this case, and the Court's analysis was essentially the same in both cases. The Court issued a detailed text order (ECF No. 84) in this case, with the following findings and instructions:

1.  The Court finds that the plaintiff and other exotic dancers who have performed at the defendants club during the proposed class period are properly classified as employees under the FLSA.

2.  The Court finds that the plaintiff has submitted sufficient evidence to carry her burden to establish that she was not paid minimum wage and overtime in violation of the FLSA. The defendant is certainly entitled to contest the number of hours the plaintiff and other class members worked, and damages remain an issue of fact.

3.  The defendant has not produced sufficient evidence to show that the payments the plaintiff received for tableside dances, couch dances, and VIP-area dances qualify as service charges that may be used to offset the defendants minimum wage obligations pursuant to 29 C.F.R. § 531.52. The defendant has not provided evidence, beyond conclusory allegations, that the payments alleged to be service charges are taken into the defendants gross receipts in their full amount.

4.  The Court grants the defendants summary judgment motion with regard to its claims that the state law claims under the South Carolina Payment of Wages Act (SCPWA) for minimum wage and overtime are preempted and invites the defendant to file a motion seeking dismissal of the remaining SCPWA claims as explained in *Degidio*. The Court declines to certify a class under Rule 23 at this time.

5.  The Court declines to grant the defendant summary judgment on its claim that the plaintiff is not entitled to liquidated damages because the defendant has demonstrated both good faith and reasonable grounds for believing that it was not acting in violation of the FLSA. The Court finds that genuine issues of material fact preclude summary judgment on this issue at this time.

6.  The Court grants conditional class certification under Section 216(b) of the FLSA. The proposed class notice (ECF No. 43-8) submitted by the plaintiff is approved. The deadlines and procedures for class notification set forth in the *Degidio* case should be followed in this case as well.

Accordingly, as set forth above, the plaintiffs motion for conditional class certification and judicial notice pursuant to 216(b) of the FLSA (ECF No. 43) is GRANTED, the motion for class certification under Rule 23 (ECF No. 42) is DENIED, the plaintiffs motion for summary judgment (ECF No. 41) on the issue of whether the defendants dancers are employees or independent contractors is GRANTED, and the defendants motion for

summary judgment (ECF No. 74) is DENIED except as to the minimum wage and overtime claims under the SCPWA as set forth above.

The Court explained in its text order that it would be issuing a statement of reasons explaining more fully why the reasoning set forth in *Degidio* applied to this case as well. The Court indicated that it wished for the cases to proceed in parallel and instructed the defendant to immediately comply with its text order. On October 8, 2015, before the Court could issue the promised statement of reasons, the defendant filed a motion seeking relief from the text order and permission to appeal (ECF No. 85). The plaintiff filed a response in opposition on October 29, 2015 (ECF No. 86). The Court provides a complete factual discussion and statement of reasons as a part of this Order denying the motion to reconsider.

## BACKGROUND

The defendant, Country Club, Inc. d/b/a Masters Gentlemen's Club (the "Club) describes itself as a "topless adult night club in Myrtle Beach South Carolina." (Def's Statement of Undisputed Material Facts ¶ 1, ECF No. 74-2.) The Club refers to its "topless dancers" as "entertainers," as their job is "to entertain [the Club's] customers on stage and on the floor of the Club." (Decl. of Mike Kap ¶ 4, ECF No. 74-3.) In addition to the stage performances, customers can also pay for certain private, individualized services, including "table-side or VIP-area dances." (ECF No. 74-2 at ¶ 33-34.)

As the entity that operates the Club, the defendant and its managers and agents have the authority and responsibility to hire and fire those who work at the Club, including the entertainers, house moms, disc jockeys, and bartenders. (Dep. of Michael Slay 17:7-18:23, ECF No. 44-1.) The defendant controls the layout of the Club, selects the food and alcohol the Club offers, maintains the building and makes any necessary

repairs to the facility. (*See id.* at 25:25-26:4, 62:21-63:13; Kap Dep. 32:2-12, 54:2-10, ECF No. 44-3.) Entertainers are not given keys to the building and have no authority to hire or fire entertainers or other employees, to change the rules that govern entertainers or patrons, to alter the physical characteristics of the building, or to make decisions about the club's food and beverage offerings. (*See id.*) The defendant advertises on its website, cable television, local radio, and in the newspaper, and its management typically determines the content of the advertising.[1] (*See* Kap Dep. 22:14-24, ECF No. 79-6.)

**Profitability of Entertainers**

The defendant admits that it does not pay entertainers any wages or include them in payroll, (*see* Def's Disc. Resp. 9, ECF No. 44; Slay Dep. 50:21-51:7, ECF No. 44-1; Taylor Dep. 51:6-11, ECF No. 79-5), and that to earn money for working at Masters, entertainers rely on money received from the Club's customers, including tips and payments for private performances, which the Club characterizes as "service charges." (*See* Def's Disc. Resp. 9, ECF No. 44.) Entertainers are an important part of the defendant's business, and there are numerous ways in which the defendant profits from its entertainers, including house fees, performance fees, and G-Buck transactions.

### *House Fees*

Entertainers are typically required to pay a nightly "house fee" to the Club in order to be able to dance. (Kap Dep. 38:23-25, ECF No. 79-6.) When asked why the Club charges its entertainers these fees, the Club's general manager, Michael Kap,

---

[1] Michael Kap testified that, in at least one instance, a particularly creative entertainer who went by the stage name "Bee Bee" (he did not know her actual name) assisted him with developing advertisements. However, entertainers are not usually involved in decisions regarding the defendant's advertising. (*See* Kap Dep. 23:10-23, ECF No. 74-5.)

responded, "[w]e always have charged house fees.  We called them locker rentals for years.  And they come in and they pay to work there."  (*Id.* at 39:21-24.)  The Club retains the house fees (they are not paid out to club employees as tips etc.).  (Kap. Dep. 40:1-22, ECF No. 74-5.)  The fees are structured to encourage the entertainers to arrive earlier in the evening to ensure that there are a sufficient number of entertainers in the Club during non-peak hours.   The Club's written rules ("Club Rules") set forth the following house fees:

- Dayshift[2]                             no house fee listed
- Happy Hour Shift[3]                 $25
- Night Shifts
    - 7:30 P.M. – Close          $25
    - After 7:50 P.M.             $35
    - After 8:50 P.M.             $45
    - After 9:50 P.M.             $100

(Club Rules 3, ECF No. 79-3; Slay Dep. 39:4-24, ECF No. 79-4; Gardner Dep. 50:2-9, ECF No. 79-2; Kap. Dep. 38:23-39:2, ECF No. 79-6.)[4]  The plaintiff alleges that there were occasions when she did not make enough money to pay Masters' mandatory house fees, but was told that she was still required to pay the house fee that same night or she "would not be welcome to come back to work the next day."  (Gardner Depo. 36:5-16, ECF No. 79-2.)

### *Performance Fees*

The Club also takes a portion of the fees charged for individualized services such as table-side dances, couch dances, and VIP-area dances.   Masters requires its

---

[2] The written rules define the dayshift as 11:30 A.M. – 8:00 P.M. Monday – Friday and 1:00 P.M. – 8:00 P.M., Saturday and Sunday.

[3] The written rules define a happy hour shift as 4:00 P.M. – 12:00 A.M.

[4] There is some inconsistency regarding the exact times and amounts for the house fees, but the testimony indicates that the times and amounts listed in the written rules generally reflect the Club's practice.

entertainers to charge customers ten dollars ($10) for a table dance, twenty-five dollars ($25) for a couch dance, and four hundred dollars ($400) per hour for dances in the club's VIP area.  If they have paid their house fees, entertainers are permitted to keep the entire $10 charged for a table dance, $20 of the $25 charged for a couch dance, and $300 of the $400 per hour charged for VIP dances, with the remaining amount being paid to the Club.  (*See* Def's Disc. Resp. 9, ECF No. 79-7.)  Entertainers are not supposed to charge less than the Club's recommended amounts, (*see* Slay Dep. 67:22-25, ECF No. 79-4), but are also warned not to overcharge customers, (ECF No. 79-3 at 4 ("Do not over-charge – it will cost you in the end!").)

The defendant characterizes the payments customers make for individualized services as "service charges," and it alleges that these fees are taken into the Club's gross receipts.  (Kap. Dep. 46:2-6, ECF No. 74-5 (testifying that the Club's portion of the fees for individualized services "go[es] to the same place that the house fee cash goes").)  In his sworn declaration submitted to the Court, the Club's general manager, Michael Kap, describes the way in which "service charges" are collected, recorded by the Club, and shared with the entertainers:

> 10. [E]ntertainers receive not only tips directly from the Club's customers, but also are compensated with service charges which the Club charges its customers for table-side dances with entertainers and private dances with entertainers in the Club's VIP areas.
>
> 11. For instance, in the Club's downstairs VIP "couch" areas, the Club charges customers $25 per private dance, **collected by a floor man**, of which, $20 is **given by the floor man to the entertainer**, and the remaining $5 goes to the Club.  These are the service charges set by the Club, and which **belong to the Club**, even though a portion of the $25 is physically handed to the entertainer as a part of her compensation **at the conclusion of the dance**. . . . .  These service charges for these VIP-area dances are tracked by the Club's floor men, the data turned into the Club,

and **the service charge amounts are ultimately taken into the Club's gross receipts.**

12. In the "upstairs" VIP area of the Club, Masters **charges the customer directly** for the use of the private room, and charges the customer a minimum charge of $200 for each 30 minute increments with an entertainer.  That service charge amount is tracked and also taken into the Club's gross receipts, even though most of the service charge is actually given to the entertainer in [sic] **at the conclusion of the dance** as part of her compensation.

(Kap. Decl. ¶¶ 10-12 (emphasis added).)   According to Kap's account above, Club employees collect the fees from the patrons, record the total amount received (which is entered into the Club's gross receipts), and then provide the entertainer with the portion of the payment to which she is entitled.

However, as he notes in his declaration, Kap resides in Atlanta and only appears at the Club about once a week, and both the plaintiff and the Club's operational manager, Michael Slay, testified that entertainers are often paid directly.  The plaintiff testified as follows:

Q. . . .   Now I want to talk about the upstairs, the private VIP areas.  In those areas, the customer pays for the room; is that right?

A. Yes.

Q. And that money, whatever the club charges for the room, that money goes directly from the customer to the club, correct?

A. Yes.

Q. Meaning you are not involved in collecting any fees for the use of the room?

A. Oh, yeah, I would, yeah.  **A lot of times they would give me all of the money and I would maybe pay for the room if, out of the money they gave me.**  Either way.  Either I could pay for the room or they would pay for the room."

(Gardner Dep. 62:20-63:9 (emphasis added).)

The testimony of Michael Slay is consistent with the plaintiff's testimony that the money for individualized services was often paid directly to the entertainer, and that the entertainer or the customer then paid the floor man for only the Club's portion of the total fee.

Q. And when a customer purchases a private dance, who do they pay?

A. **Pay the entertainer.**

Q. In cash?

A. I don't know.

Q. Well, can the dancers –

A. She can accept cash, yes.

Q. Can she accept credit or debit card?

A. No.

Q. Okay. So if a customer wants to buy a private dance he has to either have cash or G-bucks?

A. Uh-huh.

Q. Okay. And how much does the dancer have to give the club out of the price of the dance?

A. Nothing.

Q. So the dancer gets to use the VIP rooms for free?

A. She does. The customer has to rent the room for $50.

Q. Who does he pay that money to?

A. That goes to the floor man.

8

Q. So the dancer encourages the customer to buy the dance and then they walk over to the VIP area and then the customer gives the floor man $50; is that correct?

A. Uh-huh.

. . .

Q. **And then gives the dancer the rest of the price?**

A. **Whatever they determine, ye**s.

(Slay Dep. 66:11-67:21, ECF No. 79-4 (emphasis added).)  In summary, it appears that customers could either: 1) pay the entertainer the entire sum and let the entertainer pay the club portion; 2) pay the club and entertainer separately; or 3) give the floor man the entire sum, in which case the floor man would only hold the entertainer's portion temporarily before giving it to the entertainer immediately after the dance concluded.  In other words, it is not accurate to say that the full amount of the fee for individualized services is received by the defendant in every instance and then distributed to the entertainer because, at least in some instances, the testimony indicates that the entertainer's portion of the fees is being given directly to the entertainer and is never received or handled by the club.

The plaintiff also disputes whether the entire amount was actually taken into the defendant's gross receipts, pointing out that the defendant has not provided any documentation to support this claim.  Moreover, the Court is not clear what the defendant means when it claims that these charges are "ultimately taken into the Club's gross receipts," other than that the defendant believes that it qualifies for a set-off that requires that the funds be taken into its gross receipts.  There is no explanation of whether these funds are reflected in the defendant's income as set forth in its records or

reported to the IRS.  As the plaintiff has repeatedly pointed out, she never received a W-2, 1099, or any other documents from the defendant reflecting the money she earned from these performances.

Furthermore, despite the fact that the plaintiff's response to the defendant's first motion for summary judgment specifically challenged the complete lack of evidence regarding how the defendant accounted for these funds, (ECF No. 51 at 11-12), the defendant's reply attached no documents and provided no further explanation beyond a claim that it was undisputed that the fees were taken into the defendant's gross receipts, (ECF No. 54 at 9-10).  The defendant had another opportunity to support its claim regarding how the fees were accounted for when the Court invited the defendant to refile its motion for summary judgment after one of the few persuasive authorities upon which the defendant had relied was reversed by the South Carolina Supreme Court.  The defendant's refiled motion for summary judgment contains no further support for the conclusion that these funds were taken into the defendant's gross receipts or explanation of what that conclusion means for the defendant's accounting. (*See* ECF No. 74.)  Additionally, the defendant's motion to reconsider fails to add anything in the way of facts or explanation on this issue.  (*See* ECF No. 85.)  Finally, not only has the defendant failed to provide affirmative evidence demonstrating that the fees were taken into its gross receipts, it appears that the defendant has been routinely shredding the records that its floor men allegedly made of the money received for individualized performances, a practice that has apparently continued despite the pendency of this lawsuit.  (*See* Kap Dep. 43:25-45:15, ECF No. 79-6.)

### *G-Bucks*

The Club also profits from the sale and exchange of its own currency, G-bucks, which it sells to customers who don't have cash for a 10% premium.  Entertainers who are paid in G-bucks are also charged a 10% fee to convert the G-bucks back into U.S. currency.  (*See* ECF 79-7 at 14.)

## Tip Outs

The plaintiff alleges that in addition to requiring entertainers to pay house fees, the Club also requires them to tip various other employees or contractors at the Club, including the disc jockeys, house moms, floormen, bouncers, and VIP hosts.  The plaintiff testified that Judy Taylor, the Club employee who hired her, told her that she was required to tip the house mom a minimum of $10 for each shift she worked. (Gardner Dep. 31:1-25, 72:10-25 ECF No. 79-2.)   The plaintiff testified further that entertainers were required to tip the floormen a minimum of $2 each, were required to tip the manager $5 per shift, and were also required to tip the bouncers and VIP host. (*Id.* at 74:14-25.)   The defendant admits that it requires entertainers to tip the disc jockey the greater of 10% of their earnings or $10, (ECF No. 74-2 at ¶¶ 42, 63), but denies that entertainers are "required to tip or pay anything to managers, house moms, floor men/bouncers, or to the VIP host."  (Kap. Decl. ¶ 18, ECF No. 48-3; *see* also ECF No. 74-2 at ¶ 67.)   The defendant's written rules confirm the requirement that entertainers tip the disc jockey and also indicate that entertainers who worked the day shift were required to tip the manager $5.  (*See* ECF No. 79-3.)

**Rules**

The defendant alleges that "Masters has no set of 'behavioral guidelines' which it enforces" and that "[t]he only rules which Masters imposes on its entertainers are those which are common sense, or which are required to keep its liquor and business license." (Def.'s Statement of Undisputed Material Facts ¶ 8, ECF No. 74-2.) The defendant also maintains that it "does not impose fines on its entertainers," "does not impose any particular dress code on entertainers," "does not require entertainers to adhere to any particular work schedule," "does not require entertainers to strictly comply with the Club's set rotations," and "does not require entertainers [to] dress or dance in any particular way." (*Id.* ¶¶ 9, 10, 12, 14, & 19.) The record suggests, however, that the defendant actually does all of these things to some extent.

*Written Rules*

First, unlike the defendant in *Degidio*, the defendant in this case actually does have a set of written rules that it provides to each of its entertainers when they begin working at the Club. (*See* Slay Dep. 13:2-8, ECF No. 79-4 ("Q. Does [Michael Kap] ever provide you with rules that are to be applied to dancers? A. Yes. Q. Are they ever in writing? . . . A. As far as the packets the entertainers get, yes, there is a set of rules."); Taylor Dep. 15:1-6, ECF No. 79-5 (A. "Well, we have everybody read the [rule] booklet and then I go over them verbally to make sure there is no confusion on it. Q. Okay. Everybody reads the booklet when they're hired or permitted to dance, however you want to say it? A. Yes.").) These rules, which were submitted as Exhibit 2 to the Plaintiff's Response in Opposition to the Defendant's Restated Motion for Summary Judgment, are three pages long and are more than a summary of the law or common

12

sense.    Among other things, they communicate standards for appearance, an expectation that all entertainers work 4 shifts a week, a requirement that entertainers check in with the house mom, a requirement that entertainers who drive to work utilize valet parking, a prohibition on significant others in the Club while an entertainer is working, the requirement that all entertainers take a breathalyzer, a requirement that all entertainers participate in the Club's promos unless they are in a VIP room, a requirement that all entertainers make their scheduled stage appearances unless they are in a VIP room, a prohibition on chewing gum, and the requirement that all entertainers obtain a "See-Ya Pass" from the house mom before leaving work.  (*See* ECF No. 79-3.)  The rules also set the hours for various shifts, set house fees, set minimum prices for individualized services, require entertainers to tip the disc jockey, and warn entertainers not to overcharge for private dances.  (*Id.*)

The defendant seeks to minimize the significance of the "so-called 'rules,'" which are provided "mostly as a matter of habit" and are "only suggested guidelines which are not enforced."  (Def.'s Statement of Undisputed Material Facts ¶ 8, ECF No. 74-2.)  However, even if the defendant is not stringent in enforcement and treats these rules as suggestions, its total discretion over who can and cannot dance at the Club undoubtedly gives these suggestions coercive weight.  The following testimony from Michael Slay is illustrative:

> Q. How do you make the dancers follow the rules?
>
> A. We can ask them, you might want to work somewhere else.
>
> Q. So you can fire them?
>
> A. Or you can suggest they go work somewhere else.  Because they can come and go as they want.

Q. Except if you tell them not to come back?

A. We can tell them not to come back.

(Slay Dep. 47:6-16, ECF No. 79-4.)  The Club appears to take a similar position toward entertainers who fail to pay the house fees as set forth in the rules.  (*See* Taylor Dep. 34:17-20, ECF No. 79-5 ("Well, I mean, she can leave, but if you're not going to pay the house fee, then there's a good chance they're not going to let you come back as an entertainer.").)  In this context, the difference between a rule and a suggestion is thin, if not purely semantic.  Likewise, whether an entertainer is told that she is fired or it is suggested that she find another place to work and not come back, the effect is essentially the same.

### *Fines*

Second, while the defendant maintains that it does not fine entertainers, it admits that it has a sign posted warning that entertainers caught with baby wipes will be fined $100.  (*See* Slay Dep. 50:14-22, ECF No. 79-4.)  Further, while Michael Slay denied that he has ever fined an entertainer for baby wipes, he did admit to fining an entertainer who repeatedly failed to appear on stage when her name was called.  (*See id.* at 50:23-25, 51:4-13.)  So although the defendant may now claim that it does not fine its entertainers, the undisputed facts show that it has used fines in the past and it is continuing to represent to its entertainers that they may be fined for particular infractions of the rules.

### *Appearance*

Third, while the standards and rules governing an entertainer's appearance *see*m to be less stringent (or at least less specific) at Masters than at other similar

14

establishments (such as the club in *Degidio*), the defendant still exercises a measure of control over its entertainers with regard to their appearance.  Although the specific rules in this area are fairly minimal (follow the law and look nice), it is readily apparent that an entertainer's appearance is the primary factor considered in securing and retaining a job at the Club.

Although the Club alleges that its hiring process is "highly selective," it appears that as long as a woman is not overweight, excessively covered in tattoos, missing arms or legs, or emitting noticeable body odor, she is eligible to be hired as an entertainer at the Club.  (Slay Dep. 35:4-21, ECF No. 79-4.)  No training or prior dance experience is required, auditions typically take 30 seconds to a minute (if an audition is required at all), and the task of hiring is delegated to the house mom, except that if a woman comes in who is "smoking hot," management may instruct that she be hired.  (*Id.* 30:10-19, 32:1-25.)  A majority of the women who audition to work as entertainers at the Club are accepted and can begin performing shortly after their audition.  (Taylor Dep. 42:6-13, 14:5-10, ECF No. 79-5.)  Although entertainers have been fired (asked not to return) for a number of reasons, according to management, "bad dancing" has never been one of them.  (Slay Dep. 51:14-21, ECF No. 79-4.)  While the Club does not have a written dress code, it does appear that there are certain clothing and shoes that entertainers are expected to have and wear during their performances, as illustrated by the fact that the plaintiff's interview focused on whether she had the type of clothes and shoes that she would need to perform as an entertainer.  (*See* Gardner Dep. 31:6-15.)

The Club continues to exercise a measure of control over its entertainers' appearances because entertainers may not be allowed to perform for reasons such as weight gain and pregnancy.  Michael Slay testified:

> A. . . .  We had entertainers that do get pregnant.  Some show more than others.  One might show at three or four months; one might get a little further.  We just found in the past that a lot of customers really don't care for it.  So depending on the entertainer, we would move or if we could hire to do something else that wouldn't show, we would try to do that for most of the time, but we'd just rather keep that kind of . . .
>
> Q. Okay. So –
>
> A. Just looking presentable.
>
> Q. Along those lines, are dancers ever told or encouraged to lose weight?
>
> A. Sure.

(Slay Dep. 34:2-17, ECF No. 79-4.)  Thus, while the Club does not specifically dictate to an entertainer what she has to wear, the club does exercise a measure of control over her appearance because her appearance is her primary job qualification.

### ***Scheduling***

Fourth, the Club does in fact have scheduling requirements, requiring that entertainers work a minimum number of shifts per week (either 4 or 5). (*See* ECF No. 79-3 ("You are expected to work 4 shifts."); Gardner Dep. 43:12 ("Usually we had to work five days a week.").)  The Club also required that all entertainers work a number of specific shifts to ensure that it had entertainers at the club during slower times.  (*See id.* at 43:12-19 (indicating that all entertainers are required to work at least one Sunday, Monday, or Tuesday shift each week and at least one "happy hour shift" each week).)

Entertainers are not allowed to leave the Club prior to the completion of their shift without permission from the house mom.  (*See id.* at 53:5-11 (testifying that requests to leave early were typically denied); Slay Dep. 69:8-10, ECF No. 79-4 ("Q: So dancers can leave any time they want; is that correct? A: No. That's up to the house mom.").) The defendant also requires its entertainers to follow certain procedures before leaving the establishment after a night of work, which allows the Club to exercise control over both the entertainer's schedule and to ensure that she pays the required fees and tips. The Club's written rules prohibit entertainers from leaving the Club without a "See-Ya pass." (*Id.*)  The plaintiff testified that the pass had to be signed by the disc jockey and manager/house mom, and that they would only sign it if she had paid the required tips and fees.   (*See* Gardner Dep. 41:1-20, ECF No. 79-2.) Entertainers who drive themselves to the club are required to surrender their keys to the valet when they arrive and are also required to pass a breathalyzer before they are permitted to leave the Club.  (*See* Slay Dep. 41:11-21, ECF No. 79-4 69:7-18; Gardner Dep. 46:7-13, ECF No. 79-2; Taylor Dep. 29:7-11, ECF No. 79-5; Kap Dep. 49:9-17, ECF No. 79-6.)

### ***Dance Rotations and Routines***

Fifth, contrary to its claim that it does not require entertainers to adhere to the Club's dance rotations, the written rules provide that "promos are to be done by all entertainers, unless you are in the V.I.P. room," and that "stage is  to be done by all entertainers, unless you are in the V.I.P. room."  (ECF No. 79-3; *see* Gardner Dep. 85:9-15, ECF No. 79-2.)  Dancers who routinely miss their stage rotations without a good reason are reprimanded or, at least in one instance, fined.  (*See* Slay Dep. 59:5-14, 51:4-13, ECF No. 79-4.)  Finally, while the Club claims that it does dictate to its

entertainers the manner in which perform, stage sets are always three songs long, the music is selected by the disc jockey, and there is a traditional sequence of disrobing that culminates with the entertainer removing her top for the final song.  (*See* Slay Dep. 53:16-25, 57:17-24.)

While the facts set forth above differ from the facts of *Degidio* in certain particulars, the business model is very similar to that followed by the defendant in *Degidio*.  This model is not only common to these defendants, but as the Court learned in reviewing well over a dozen similar cases, is fairly standard in this industry.

## STANDARD OF REVIEW

### Motion to Reconsider/Motion to Stay

"Although the Fourth Circuit Court of Appeals has not specifically articulated the standard for evaluating a motion for reconsideration filed under Rule 54(b), the Court has held motions under Rule 54(b) are 'not subject to the strict standards applicable to motions for reconsideration of a final judgment.'"  *Long v. O'Reilly's Auto. Stores, Inc.*, No. CIV.A. 6:12-901-MGL, 2014 WL 2864589, at *1 (D.S.C. June 23, 2014) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003).  "So long as the same case remains alive, there is power to alter or revoke earlier rulings."  18B Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure 4478,  637 (2d ed. 2002).  Nevertheless, "[d]istrict courts in the Fourth Circuit look to the standards of motions under Fed.R.Civ.P. 59 for guidance."  *Id; see also Pure Fishing, Inc. v. Normark Corp.*, No. 3:10-2140-CMC, 2012 WL 4009628, at *1 (D.S.C. Sept. 12, 2012), *aff'd,* 564 F. App'x 601 (Fed. Cir. 2014) ("This court finds the standard applicable to reconsideration of final orders useful, though non-binding.").  As with a

motion under Rule 59, "appropriate reasons for granting reconsideration under Rule 54 are: (1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice." *Long*, 2014 WL 2864589 at * 2.

Under 28 U.S.C. § 1292(b), a district court may certify an interlocutory appeal when (1) the appeal involves a controlling question of law, (2) as to which there is substantial ground for disagreement, and (3) immediate appeal may materially advance the ultimate termination of the litigation. *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 623 (D. Md. 2013). "All three elements must be satisfied for certification." *Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr., Inc.*, No. 6:13-cv-1067-HMH, 2013 WL 5946109, at *2 (D.S.C. Nov. 6, 2013) (quoting *Anselmo v. West Paces Hotel Grp., LLC*, No. 9:09-cv-2466–MBS, 2011 WL 1049195, at *21 (D.S.C. Mar. 18, 2011)). "Whether to certify an interlocutory appeal is within the district court's discretion. However, '§ 1292(b) should be used sparingly and . . . its requirements must be strictly construed.' . . . '[T]he kind of question best adapted to discretionary interlocutory review is a narrow question of pure law whose resolution will be completely dispositive of the litigation[.]'" *Lynn*, 953 F.Supp.2d at 623 (quoting *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989); *Fannin v. CSX Transp., Inc.*, 873 F.2d 1438 (Table), 1989 WL 42583, at *5 (4th Cir. 1989)).

### Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).   The movant bears the initial burden of

demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or  "showing . . . that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252.  Conclusory allegations or denials, without more, are likewise insufficient.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th

Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

Whether a worker is classified as an employee under the FLSA is a question of law. *See Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004). "Employee status can be determined by the district court on a motion for summary judgment where there are no genuine disputes of material fact." *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 147 (D.D.C. 2011). As will be discussed, numerous federal courts have recently issued decisions resolving similar cases on motions for summary judgment.

## DISCUSSION

On October 8, 2015, the defendant filed a motion for reconsideration, requesting that the Court vacate the text order that it issued on September 30, 2015. In support of its motion the defendant argues: (1) that "the Court did not analyze the facts in the record of this specific case, and instead, decided because this case is 'factually similar' to *Digidio* [sic], it should be decided exactly the same way"; (2) that "[t]he Court should relieve Defendant from having to produce a list of entertainer names, addresses and telephone numbers which does not exist, and because this information was already produced to Plaintiff's counsel in discovery in mid-August, 2014"; (3) that "[t]he Court should reconsider and relieve Defendant from having to post a notice in its Club when there has been no showing by Plaintiff that service of the notice by U.S. Mail is inadequate or insufficient to give putative class members notice of this civil action"; and (4) that "[t]he Court should modify its Text Order to include language which stays this

proceeding and which permits Defendant to petition the U.S. court of Appeals for the Fourth Circuit to consider an interlocutory appeal."

The defendant alleges that the Court failed to analyze the facts of this case and simply assumed that the outcome in *Degidio* would control the outcome here as well. According to the defendant, such an assumption is not only misplaced, but "raises a host of due process concerns." (ECF No. 85-1 at 2.)  The argument is ironic given that *this defendant* previously indicated to the Court that the cases were so similar that the outcome in one would be precedent for the other:

> Ms. Gardner is also prosecuting (or otherwise participating in) at least two other, **virtually identical civil actions**: . . . *Alexis Degidio, individually and on behalf of all others similarly situated v. Crazy Horse Saloon and Restaurant, Inc. d/b/a The New Dollhouse*, Case No. 4:13-cv-02136-BHH (filed August 8, 2013).  Therefore, the Court's decision in this case may well have **precedential effect** on other civil actions currently pending before the Court.

(ECF No. 74-1 at 2).

It is reasonable to expect that a court would treat two **"virtually identical civil actions"** in a similar manner, but this Court did not simply assume that the outcome in this case was controlled by *Degidio*.  Rather, as its order indicated, the Court carefully reviewed the record in this case before concluding that the analysis that was set forth in great detail in *Degidio* controlled here as well.  In candor, the Court actually conducted its review of the record in this case *before* it examined the record in *Degidio*.  However, after reviewing both cases, the Court determined that *Degidio* was more fact intensive and complicated than this case, and that while the analysis in *Degidio* covered and controlled all of the critical issues present in this case, the converse was not true. Although it is quite obvious that this case is very similar to *Degidio*, and although the

outcome set forth in the text order logically follows from the Court's ruling in *Degidio*, the Court is providing the defendant with a thorough explanation of the analysis it conducted as a part of this order denying the motion to reconsider.  Still, the Court assumes familiarity with its *Degidio* Order and, given the length of the analysis in both cases, incorporates some of its discussion by reference, especially where the similarity of the cases is obvious and uncontested.  What follows is an order denying the motion for reconsideration, which incorporates a statement of reasons that more completely explains the basis for the Court's September 30, 2015 text order.

Before turning to the merits, the Court will address the defendant's arguments regarding notice to the class.  The defendant argues that it is unduly burdensome to make it compile an electronic list with information contained in paper files that it has already produced to the plaintiffs.  At this point, the task of compiling this information into a useable (electronic) format, verifying the accuracy of the information, and identifying where information is missing is going to fall on one party or the other.  The defendant has not explained to the Court why the burden should fall on the plaintiff; it hardly seems unreasonable in 2015 to expect an entity that has employed over 450 people in the last five years to be able to provide basic information about its employees in an electronic format.  Moreover, given the nature of the industry, which the defendant admits is "[v]ery transient," [5] it would not be at all surprising if some of the contact information that the defendant previously provided is no longer accurate.  The defendant is in a superior position to update the information that it previously provided, and the Court does not find its instruction to be unreasonable or unduly burdensome.

---

[5] (Dep. of Michael Kap 52:4-7, ECF No. 74-5).

The defendant also argues that it should not be required to post the notice ordered by the Court in its place of business in the absence of a showing that notice by U.S. Mail is insufficient.  In response, the plaintiff argues that, given the admittedly transient nature of the industry, the addresses contained in the defendant's files may no longer be accurate, a concern the Court shares.  Moreover, the defendant's argument that the notice will create an unreasonable distraction is unpersuasive.  The defendant is to comply with the Court's instruction if it has not already done so.

I.     **State Law Claims**

As in *Degidio*, the Court begins its analysis with the defendant's argument that the plaintiff's claims under the South Carolina Payment of Wages Act (SCPWA), S.C. Code 41-10-10 *et seq.*, are preempted by the FLSA.  (*See* ECF No. 74-1 at 22-24.)  In its text order, the Court granted the defendant's motion for summary judgment on the plaintiff's state law minimum wage and overtime claims, finding them to be preempted. The Court also invited the defendant to move for dismissal of the remaining state law claims on substantive grounds, including the argument that the term "wages" in § 41-10-40 does not include tips.  The defendant has filed the motion invited by the Court, and the Court will address the issue in due course.  The Court's reasons for finding preemption of the state law minimum wage and overtime claims, inviting the motion to dismiss on the remaining state law claims, and declining to conduct the Rule 23 analysis are the same in this case as they were in *Degidio*.  The plaintiff advanced the same claims, the defendant made virtually the same arguments in response, and the Court finds the same outcome to be appropriate.

II.    **FLSA**

As the Court explained in *Degidio*, the FLSA applies to employees, but not to independent contractors. *Chao v. Mid-A. Installation Services, Inc.*, 16 Fed. App'x 104, 105 (4th Cir. 2001)(unpublished). The Act defines the term "employ" as to "suffer or permit to work," 29 U.S.C. § 203(g), and defines an "employee" as "any individual employed by an employer," 29 U.S.C. §§ 203(e)(1). "[R]ecognizing that broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency," the Supreme Court "has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction." *Tony and Susan Alamo Found. v. Sec. of Lab.*, 471 U.S. 290, 296 (1985) (quotation marks and citations omitted); *see also Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (observing that the FLSA "should be broadly interpreted and applied" in light of its "remedial and humanitarian" purpose).

A.  **Employee Status**

"The determination of 'employee' status under the FLSA is a question of law, although it depends on subsidiary factual determinations. Employee status can be determined by the district court on a motion for summary judgment where there are no genuine disputes of material fact." *Verma v. 3001 Castor, Inc.*, CIV.A. 13-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014) (quotation marks and citation omitted). That some or all of the workers in question express a desire to be classified as independent contractors and excluded from the Act is not dispositive. The Supreme Court explained that "the purposes of the Act require that it be applied even to those who would decline its protections" and reasoned that if an exception were available

25

based on the representations of a protesting employee, employers would be incentivized "to use [their] superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act."  *Tony and Susan Alamo Found.*, 471 U.S. at 302.  Such a practice would affect not only the workers at issue, but would "be likely to exert a general downward pressure on wages in competing businesses." *Id.*

A plaintiff seeking relief under the FLSA bears the initial burden of establishing the existence of "an employer-employee relationship," but once the plaintiff has done so, "the employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements."  *Benshoff*, 180 F.3d at 140.  The critical inquiry is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (quotation marks, citation, and alteration omitted); *see also Brock v. Super. Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.").  To make this determination, the Court applies a six-factor test that considers:

> (1) the degree of control that the putative employer has over the manner in which the work is performed;
> (2) the worker's opportunities for profit or loss dependent on his managerial skill;
> (3) the worker's investment in equipment or material, or his employment of other workers;
> (4) the degree of skill required for the work;
> (5) the permanence of the working relationship; and
> (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Schultz*, 466 F.3d at 304-05; *see also Chao*, 16 Fed. App'x at 106 (applying the same six-factor test). No single factor is dispositive, *Schultz*, 466 F.3d at 305, and the Court must "look at the totality of the circumstances and consider any relevant evidence," *Morrison v. Intl. Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001).

As the Court explained in *Degidio*, it is significant that the vast majority of the district courts (including those within the Fourth Circuit) to have considered whether exotic dancers are employees or independent contractors have found them to be employees. *See, e.g., Mason v. Fantasy, LLC*, 13-CV-02020-RM-KLM, 2015 WL 4512327, at *13 (D. Colo. July 27, 2015); *Henderson v. 1400 Northside Drive, Inc.*, 1:13-CV-3767-TWT, 2015 WL 3823995, at *5 (N.D. Ga. June 19, 2015); *Verma v. 3001 Castor, Inc.*, CIV.A. 13-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014): *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 279 (D. Md. 2014); *Stevenson v. Great Am. Dream, Inc.*, 1:12-CV-3359-TWT, 2013 WL 6880921, at *6 (N.D. Ga. Dec. 31, 2013); *Hart v. Rick's Cabaret Int'l, Inc.,* 967 F. Supp. 2d 901, 912–13 (S.D.N.Y. 2013); *Collins v. Barney's Barn, Inc., et al.,* No. 4:12CV00685 SWW (E.D. Ark. Nov. 14, 2013); *Butler v. PP & G, Inc.*, CIV.A. WMN-13-430, 2013 WL 5964476, at *9 (D. Md. Nov. 7, 2013) *reconsideration denied,* CIV.A. WMN-13-430, 2014 WL 199001 (D. Md. Jan. 16, 2014); *Thornton v. Crazy Horse, Inc.,* No. 3:06–CV–00251–TMB, 2012 WL 2175753 (D. Alaska June 14, 2012); *Clincy v. Galardi S. Enters., Inc.,* 808 F. Supp. 2d 1326, 1343 (N.D. Ga. 2011); *Thompson v. Linda and A. Inc.,* 779 F. Supp. 2d 139, 151 (D.D.C. 2011); *Morse v. Mer Corp.,* 2010 WL 2346334, at *6 (S.D. Ind. 2010); *Harrell v. Diamond A Entm't Inc.,* 992 F. Supp. 1343, 1348 (M.D. Fla. 1997); *Reich v. Priba Corp.,* 890 F. Supp. 586, 594 (N.D. Tex. 1995); *Martin v. Priba Corp.,* 1992 WL 486911, at *5

(N.D. Tex. 1992); *see also Reich v. Circle C. Investments, Inc*., 998 F.2d 324, 330 (5th Cir. 1993) (affirming district court's determination that exotic dancers were employees under the FLSA).

In contrast, the persuasive authority from analogous cases favoring the defendant is conspicuously thin, and includes a 15-year old decision from the District of Oregon and a two-page order from the Eastern District of Arkansas granting the defendant's seemingly unopposed motion for summary judgment. *See Matson v. 7455, Inc.,* No. 98–788, 2000 WL 1132110, at *4 (D.Or. Jan.14, 2000); *Hilborn v. Prime Time Club, Inc.,* No. 11–00197, 2012 WL 9187581, at *1 (E.D. Ark. July 12, 2012).

In its motion to reconsider, the defendant argues that the Court improperly "based its decision upon a variety of non-binding, district court decisions from outside South Carolina and the Fourth Circuit, rather than analyzing the specific facts of this case to the facts in *Schultz v. Capital Int'l Sec. Inc.,* 466 F.3d 298 (4th Cir. 2006) and *Chao v. Mid-Atlantic Installation Services, Inc*., 16 Fed. App'x 104 (4th Cir. 2001), both of which *are* binding decisions on this Court." (ECF No. 85-1 at 6-7 (emphasis in original).) As explained above and in *Degidio*, the Court has considered the *Chao* and *Schultz* cases and applied the "economic realities" test as set forth therein. Like *Chao* and *Schultz*, the district court decisions cited above identify "economic realities" as the appropriate standard and apply five- or six-factor tests that are either identical or very similar to the tests set forth in *Chao* and *Schultz*.[6] The establishments at issue in the various FLSA strip club cases all follow a similar business model that is somewhat

---

[6] The tests applied by some of these courts reorder the factors or combine two factors that are distinct in the Fourth Circuit's formulation of the test into a single factor. *See, e.g., Hart*, 967 F. Supp. 2d at 912 (combining the "opportunities for profit or loss" and "worker's investment" factors into a single factor); *Thompson*, 779 F. Supp. 2d at 147 (same). The Fifth Circuit does not appear to have considered the degree to which the services rendered are integral to the alleged employer's business.

eccentric and unique, so it is helpful that so many other district courts have thoughtfully considered how the economic realities test applies in this context and reached similar conclusions. In short, the district court decisions cited above are not inconsistent with *Chao* and *Schultz*, rather they are persuasive authorities that illustrate how the economic realities test should be applied in this specific context.

With the trend rolling in an unfavorable direction, however, the defendant would like the Court to reinvent the wheel. To do so, the Court would have to ignore an overwhelming consensus among district courts handling factually similar cases in almost every circuit and ignore significant factual differences between this case and *Chao* and *Schultz*. The defendant's position is without merit. *Chao* and *Schultz* set forth the applicable test, but they in no way restrict the Court from considering consistent persuasive authority from factually analogous cases.[7]

The defendant's motion to reconsider also argues that this case is not analogous to the district court cases cited as persuasive authority or to *Degidio* (even though the defendant previously claimed that the two cases were "virtually identical"). These arguments are unpersuasive, and, as the discussion below makes clear, this case is substantively similar to the persuasive authority cited above and is virtually identical to *Degidio* with regard to the material facts. Where there are distinctions between this case and *Degidio*, they are in most instances *detrimental* to the defendant's argument. As the discussion below will also make clear, the Court correctly held that the

---

[7] The defendant's argument that the Court unduly relied on persuasive authority is ironic given the fact that the defendant was relying heavily on far less persuasive authority – a decision by the South Carolina Court of Appeals classifying an exotic dancer as an independent contractor for the purposes of workers compensation --- until that authority was overturned by the South Carolina Supreme Court. *See Lewis v. L.B. Dynasty, Inc.*, 732 S.E.2d 662, 663 (S.C. App. 2012) *rev'd sub nom. Lewis v. L.B. Dynasty*, 770 S.E.2d 393 (S.C. 2015).

defendant's entertainers are employees under the economic realities test, and the Court declines to alter its ruling or stay the action to allow the defendant to appeal.

### i.  Degree Of Control

The first factor is the degree of control that the putative employer has over the manner in which the work is performed.  In analyzing this factor in *Degidio*, the Court considered:

a.  Dress code requirements;
b.  Sign-in requirements;
c.  A sequence in which performers are to appear on stage;
d.  House fees;
e.  Minimum prices for couch and VIP dances;
f.  Tip-sharing requirements;
g.  A requirement that entertainers consent to appearing on the Club's live webcast; and
h.  Various policies intended to maintain a sense of class in the establishment.

A comparison of the facts above with the facts in *Degidio* reveals substantial similarities in the practices of both clubs and supports the Court's conclusion that the clubs have misclassified their entertainers in both instances.

### a.  Dress Code Requirements

The defendant's motion to reconsider argues that the Court ignored meaningful differences between the defendant and the club in *Degidio* ("Thee Dollhouse") in their rules regarding dress and conduct.

> Club Masters does not have the number of "rules" regulating the conduct of dancers as was identified in *Digidio,* nor do Defendant's "rules" appear to be as stringent, such as for their dress entertainers (Taylor Dep. 52-54; Slay Dep. 44:11-12; Kap Dep. 57:19) or their appearance. [sic] (Taylor Dep. 54:13-19; Slay Dep. 44:15-17).

The Court agrees with the defendant that its rules regarding dress and conduct do not appear to be as stringent as those enforced in *Degidio*.  Of course, the defendant fails

to mention that, unlike Thee Doll House, it actually *has written rules*, which makes it more similar to the typical club in the persuasive district court cases than the Thee Dollhouse was.  While *Degidio* makes clear that a club cannot avoid having its entertainers classified as employees simply by declining to provide written rules and by characterizing its unwritten rules as "guidelines" or "suggestions," it does not imply that the presence of written rules is unimportant.

### b.  Sign-in Requirements

As in *Degidio*, the Club requires its entertainers to sign in.  The defendant arguably asserts additional control over its entertainers by requiring them to take a breathalyzer test and obtain a "See-Ya" pass from the house mom before leaving the club.

### c.  A Sequence in which Performers are to Appear on Stage

Like the defendant in *Degidio*, the defendant in this case has a stage rotation that its entertainers are supposed to follow.  Unlike the defendant in *Degidio*, the defendant has actually fined an entertainer for failing to comply with it.  In both cases, there is a customary sequence of undress.

### d.  House Fees

Both clubs require their entertainers to pay house fees, as do the clubs in the persuasive district court cases.

### e.  Minimum Prices for Couch and VIP Dances

Both clubs set minimum prices for dances that are typically supposed to be adhered to by the dancers.

### f.  Tip-Sharing Requirements

31

Both clubs claim that tip outs are "optional," but the record indicates that entertainers at both clubs are expected to tip club employees, such as the house moms or floormen, who provide a service to the dancers and the clubs. Whether this is characterized as a "suggestion" or a "rule," the testimony indicates that the expectation is communicated to the entertainers by management or a house mom, who is effectively operating as an extension of club management. In this case, the defendant actually admits that its entertainers are required to tip the disc jockey.

### g.  Webcam

Unlike Thee Dollhouse, the defendant does not broadcast webcam footage from its stage and dressing rooms. While the presence of the webcam is yet another way in which Thee Dollhouse exercises control over its entertainers, the absence of a webcam does not undermine the Court's conclusion that the defendant in this case exercises significant control over its entertainers. The absence of a webcam does not meaningfully distinguish this case from the persuasive authorities, most of which do not mention webcams, nor is it sufficiently significant to alter the outcome or to meaningfully distinguish the case from *Degidio*.

### h.  Policies Intended to Maintain a Sense of Class

While the Court agrees with the defendant that Thee Dollhouse appears to enforce more rigorous standards for dress and conduct, a lot of the basic rules and admonitions are the same: No chewing gum, no cell phone use on the floor, no smoking in select areas, look nice, "act like a lady," etc.

In conclusion, the Court finds that the defendant in this case exercises a degree of control over its entertainers that is similar to, if not greater than the control exerted by

Thee Doll House in *Degidio*.  The fact that the defendant issues written rules, uses fines (or at least the threat of fines), requires that entertainers work a minimum number of shifts each week, and requires that entertainers submit to a breathalyzer and obtain a "See-Ya" pass before leaving the Club at the end of a shift easily make up for the few practices employed by Thee Dollhouse that the defendant claims are distinct (*e.g.*, use of webcams and unusually high standards for dress).  In all other respects, the Court finds that the defendant's practices are very similar to the practices employed by Thee Dollhouse and finds that the defendant exerts considerable control over its entertainers.

### ii.  <u>Opportunities For Profit Or Loss</u>

Regarding opportunities for profit or loss, the Court finds that the entertainers at issue in this case are not materially distinguishable from the entertainers in *Degidio* and other similar cases.  As the Court noted in *Degidio*, the argument "that dancers can 'hustle' to increase their profits" has "been almost universally rejected."  *McFeeley, LLC*, 47 F. Supp. at 270.  Moreover, in factually similar instances, courts have found that exotic dancers have relatively minimal opportunities for profit or loss, particularly when compared to those who operate the clubs in which they dance.  *See, e.g., Hart*, 967 F. Supp. 2d at 920 (reasoning that in light of the defendant's "control over most critical determinants of the number of customers who visited the Club on any given night or over time, the Club exercised a high degree of control over a dancer's opportunity for profit"); *Butler*, 2013 WL 5964476, at *4 (finding that the fact that entertainers lacked the opportunity to share in the profits or losses of the business favored classifying them as employees).

### iii. __Investment__

The defendant argues in its motion to reconsider that this case is distinguishable from *Degidio* on the issue of investment.   In *Degidio*, "the Court found that the defendant made substantial investments in Thee New Doll House, investing over $1 million in remodeling and maintenance projects inside the club, and that it planned to spend another $1.2 million to remodel the exterior of the Club."   (ECF No. 85-1 at 7 (citing *Degidio*, Slip Op. at 2).)  The defendant argues that there is no comparable evidence in this case, and therefore the cases are distinguishable.  (*Id.*)  Comparable evidence is not required for this factor to favor the plaintiff.  The defendant owns and operates a gentlemen's club that accommodates between 500-700 people on a given day during golf season.  (*See* Slay Dep. 53:6-9, ECF No. 79-4.)  It has numerous stages and has special areas for different types of performances on three different floors of the building.  (*Id.* at 51:22-25; Gardner Dep. 59:22 – 60:6, ECF No. 79-2.)  It sells food and alcohol.  It advertises on its website, cable television, local radio, and in the newspaper. (*See* Kap Dep. 22:14-24, ECF No. 79-6, Def.'s Disc. Responses 7, ECF No. 79-7.)  It employs or contracts with managers, a house mom, floormen, valets, and disc jockeys and has employed over 450 entertainers.  (*See* ECF No. 85-1 at 4 (noting that the defendant turned over 453 dancer folders to the plaintiff).)  The Court does not need exact financial figures to reasonably conclude that a substantial investment is required to operate such a business.

According to the defendant, the plaintiff's investment consists of house fees and the costs associated with her appearance and dress, including a wardrobe of gowns and shoes for exotic dancing.  Even if the gowns and shoes are relatively expensive ($60 - $140 for a gown), and even if the plaintiff does have "a closet full of them," her

investment is still tiny compared with the investment necessary to own, operate, and maintain an establishment like the Club.  That the plaintiff's relative investment was very small, as opposed to infinitesimal, does not change the fact that here, as in *Degidio*, the defendant's investment clearly dwarfs the plaintiff's.

Nevertheless, the defendant maintains that "on this prong of the economic realities test alone (e.g. relative investment of the parties), there are substantial grounds for difference of opinion as to whether this prong of the test weighs in favor of finding an employer-employee relationship between Ms. Gardner and Masters."  (ECF No. 85-1 at 7.)  The argument is unpersuasive.  The defendant has not directed the Court to a single case where any other court has given serious consideration to the claim that the investment of an exotic dancer in her house fees, clothing, hair, makeup, and other similar expenses is comparable to the resources that defendants invest to run the clubs where these women perform.  Indeed, courts have found exactly the opposite.  *See, e.g., Reich,* 998 F.2d at 324-28 ("A dancer's investment in costumes and a padlock is relatively minor to the considerable investment Circle C has in operating a nightclub."); *McFeeley*, 47 F. Supp. 3d at 271 (The "undisputed facts show that Defendants investment in the clubs greatly exceeded Plaintiffs' investment.  Aside from the dancers providing their own work apparel and occasional food and decorations for events, Plaintiffs did not invest in the exotic dance clubs.").  As in *Degidio*, The third factor weighs in favor of finding an employer-employee relationship.

### iv.  Degree Of Skill Required For The Work

This case is effectively identical to *Degidio* with regard to this factor.  In both instances, the defendants claim that their hiring practices are "highly selective."  In both

instances, testimony reveals that a majority of those who apply are hired and that physical appearance is the primary consideration.  The fact that the plaintiff has prior experience as an exotic dancer and a background with dance, cheerleading, and gymnastics from her childhood does not establish that any considerable skill is required to be an entertainer at the Club.  Indeed, the Club's manager boasted that he would instruct the house mom to hire women who walked into the Club who he found attractive.  (Slay Dep. 32:1-5, ECF No. 79-4.)  As in *Degidio*, the Court declines to consider this a "skill."  *See, e.g., Mason*, 2015 WL 4512327, at *10 ("Courts have held that there is little to no skill required to be a nude dancer."); *Stevenson*, 2013 WL 6880921, at *5 ("Taking your clothes off on a nightclub stage and dancing provocatively are not the kinds of special skills that suggest independent contractor status.").  The fourth factor weighs in favor of finding an employer-employee relationship.

### v.  Permanence Of The Working Relationship

The defendant has not submitted evidence regarding how long entertainers typically perform at the club.  However, in his testimony, Michael Kap described the adult entertainment business as "[v]ery transient," a characterization that is echoed in similar cases from other districts.  Furthermore, it appears that the plaintiff only worked for the defendant for a matter of months.  (*See* Gardner Dep. 44:5-9, ECF No. 79-2.)  On the other hand, the defendant represents to its entertainers that they are required to work a minimum of four shifts a week and are required to work at least one shift on traditionally slower days (Sunday-Tuesday) and one happy hour shift.  In this respect, the relationship appears to be more structured than in *Degidio*, where no such blanket requirement was represented to the entertainers.  While the defendant's evidence is

somewhat weaker on this factor than it was in *Degidio*, the Court still finds that the analysis in *Degidio* applies here as well.   As in *Degidio*, the fifth factor favors the defendant, but it is not enough to overcome the numerous other factors that favor the plaintiff.   *See, e.g., Mason*, 2015 WL 4512327, at *10 ("[T]he Court gives this factor, based upon the profession at issue in this matter, only limited weight in comparison with the other factors considered under the economic realities test."); *McFeeley*, 47 F. Supp. 3d at 272-73 ("The lack of permanence in the relationship between the clubs and the dancers is not outcome determinative in the overall determination of whether the dancers were employees of the clubs."); *Stevenson*, 2013 WL 6880921, at *5 (The lack of permanence "alone cannot nudge the Plaintiffs out of the protective sphere of the FLSA.").

The defendant's motion to reconsider alleges that the Court's order in *Degidio* improperly diminished the weight of this factor.   (*See* ECF No. 85-1 at 9.)   To be clear, the Court affords the factor limited weight not because it is irrelevant, but because it is the only factor in the entire test that favors the defendant's position and because the defendant has not presented any evidence to indicate that its relationships with its entertainers are less permanent than what is typical in the industry.   If the transient nature of the industry were alone sufficient to classify entertainers as independent contractors, the trend in analogous cases would be in the opposite direction.

### vi.   Degree To Which Services Rendered Are An Integral To Putative Employer's Business

The defendant concedes that exotic dancers are integral to operations as a gentlemen's club.   As in *Degidio*, this factor weighs in favor of finding an employer-employee relationship.

### vii.  Consideration of All Factors

As in *Degidio*, factors one, two, three, four, and six support classifying the defendant's exotic dancers as employees as opposed to independent contractors, and the Court easily concludes that the plaintiff was an employee.  The defendant seizes on irrelevant distinctions in an effort to distance itself from the clubs in the persuasive authorities and the club in *Degidio*.  These arguments ignore substantial similarities in the way all of these clubs operate and emphasize minutia and semantics over substance.  After considering all of the factors, the Court finds that the defendant's entertainers are employees under the FLSA.

### B. Not Properly Compensated

As in *Degidio*, it is undisputed that the defendant did not pay the plaintiff or any of the other dancers any wages for their services at the Club.  (Def's Disc. Resp. 9, ECF No. 44; Slay Dep. 50:21-51:7, ECF No. 44-1; Taylor Dep. 51:6-11, ECF No. 79-5.)  Nevertheless, the defendant argues (1) that it is entitled to summary judgment because the plaintiff has not carried her burden to establish that she ever worked more than 40 hours in a given workweek, and (2) that it is entitled to a set-off for its wage obligations for what it characterizes as "service charges."  The Court addressed the same arguments in *Degidio*, and its analysis is very similar here.

### i. Overtime

The plaintiff did not keep precise records of her work hours, but testified that she typically worked five days a week for shifts between 6 and 11 hours long and thus worked over 40 hours-a-week in at least some instances.  This testimony is sufficient to raise a genuine issue of material fact regarding whether the plaintiff worked overtime.  The FLSA requires an employer to maintain accurate records of the hours worked by its

employees.  As the Court explained in *Degidio*, an employer may not neglect its record keeping obligation and then prevail on summary judgment against its employee simply because the employee cannot precisely recreate his or her hours with supporting documentation.  *Degidio*, 4:13-CV-02136-BHH, 2015 WL 5834280, at *14-15, *18.  The defendant's testimony here is sufficient to survive summary judgment in this case.

### ii.  Set-Off for Service Charges

The defendant argues that it should be allowed to offset its wage obligations to its entertainers for the "service charges" that customers pay for table-side dances, couch dances, and other VIP-area dances.[8]  29 C.F.R. § 531.55 provides in relevant part:

> (a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t).

> (b) . . . service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

*Id.*

In *Degidio*, this Court followed the approach taken by the Southern District of New York in *Hart*, where the court held that the defendant could only receive credit for these fees if the payments were included in the defendant's gross receipts and paid to the entertainers out of those funds.  The *Hart* court identified several practical and policy

---

[8] To whatever extent the defendant in this case is arguing that the plaintiff was not undercompensated because she made more than minimum wage through tips, the argument is rejected for the same reasons set forth in *Degidio*.  *See Degidio*, 4:13-CV-02136-BHH, 2015 WL 5834280, at *16.

considerations that weighed in favor of such an interpretation. First, requiring service fees to have been included in gross receipts "advances the FLSA's goal of assuring that the employee is paid, with mandatory deductions taken from the employee's wages." *Hart*, 967 F. Supp. 2d at 929. Second, the absence of such a rule "create[s] intolerable problems of proof" making it very difficult to determine whether the employer has actually met its minimum wage obligations. *Id.* at 930. Other courts outside of New York have also followed the rule set forth in *Hart*. *See Geter v. Galardi S. Enterprises, Inc.*, 14-21896-CIV, 2015 WL 2384068, at *5 (S.D. Fla. May 19, 2015); *Henderson*, 2015 WL 3823995, at *4.

In its motion to reconsider, the defendant objected to the Court's citation of *Hart* as follows:

> The Court apparently based its conclusion on the holding in *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901 (S.D.N.Y. 2013), a non-binding decision from the Southern District of New York. Specifically, the Court appears to place significant weight on the portion of the holding in *Hart* which appears to specifically require employers to distribute the service charges to the entertainers. However, Defendant is aware of no such binding authority in the Fourth Circuit, and at best, the method of distribution of the service charge payment to the entertainer is merely one out of several factors courts use to determine whether a dance fee is a tip or a service charge. *Thornton v. Crazy Horse, Inc.,* 2012 WL 2175753, at *9 (D. Alaska 2012).

(ECF No. 85-1 at 10-11.)

First, the *Thornton* case cited by the defendant is no more binding on this Court than the ruling in *Hart*. The Court's order in *Degidio* specifically addressed the six-factor test from *Thornton* and thoroughly explained why this Court was adopting the approach set forth in *Hart*. Second, the requirement that employers distribute service charges to their employees in order for them to be used in a set-off is drawn directly from the language of the governing regulation: "Where such sums *are distributed by the*

*employer to its employees*, however, they may be used in their entirety to satisfy the monetary requirements of the Act."  29 C.F.R. § 531.55(b) (emphasis added).

As thoroughly explained above, the testimony in this case, as in *Degidio*, indicates that in some or many instances, the ostensible "service charge" is given by the patron directly to the entertainer who pays the room fee and keeps the rest, or that the patron pays the floorman the room fee and gives the remainder of the charge and whatever other money he has agreed to pay directly to the entertainer.  (Slay Dep. 66:11-67:21, ECF No. 79-4; Gardner Dep. 62:20-63:9.)   The defendant has not explained to the Court how these arrangements satisfy the requirement that the funds be "distributed by the employer to its employees."  29 C.F.R. § 531.55(b).

The defendant argues that its practices are in line with guidance received by an associate of Michael Kap from a representative of the Department of Labor in a letter that was submitted with Kap's declaration.   The defendant argues that this letter supports the defendant's position on the service charge issue and entitles the defendant to a ruling from the Court precluding liquidated damages.  A careful examination of the letter and the surrounding circumstances reveals that it is far less significant than the defendant alleges and that the defendant's reliance on it is not nearly as reasonable as the defendant suggests.

The defendant is not relying on a letter that *it* received indicating that *its* practices were in compliance with the FLSA.  Rather, it is relying on a letter that an individual named Scott Lawson received in connection with clubs that Mr. Kap operated in Atlanta, and it is then asking the Court to rely on Mr. Kap's representation that the system developed at the Atlanta clubs is being followed at the defendant's club.  In this respect,

the letter is not so different from the district court opinions that the defendant is so quick to dismiss. It represents an example of how a regulation has been applied in an analogous, but separate instance. However, unlike most of the district court opinions considered by the Court, the letter presented by the defendants is *over twenty years old*, having been issued in 1993. The owner and operator of a strip club would have to have his head buried in the sand not to know that in the intervening years there have been considerable developments in the law regarding the status and compensation of exotic dancers under the FLSA.[9]

Not only is the letter clearly outdated, the defendant has not even bothered to follow the instructions it provides. The letter appears to assume that exotic dancers will be classified as employees, a position the defendant clearly rejected. The letter then explains that while "[t]here is no requirement that an actual check be cut to the employee" to distribute the service charges, "the employer's records must accurately reflect the number of hours worked by the employee and the compensation received." (*See* ECF No. 74-3.) The defendant claims that it complied with these record keeping requirements:

> Here, Masters has at all relevant times acted in good faith reliance upon the opinion it received from the Department. The Club tracks the hours its entertainers arrive and depart the Club (Kap. Dep. 48:14-20; Slay Dep. Ex. 3) . . . . Accordingly, because of Master's good-faith reliance upon (*and compliance with*) a written opinion letter from the Wage and Hour Division specifically addressing an allowable compensation program for exotic dancers, to the extent any back wage liability is imposed on Masters, the Court should decline to impose liquidated damages.

(ECF No. 74-1 at 21-22 (emphasis added).)

---

[9] Here the Court is quite confident that the defendant was aware of this shift because Mr. Kap and another club he operates were defendants in one of the analogous district court opinions cited by the Court and were represented by none other than Mr. Fuchs. *See Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1329 (N.D. Ga. 2011).

The cited exhibit to the Slay Deposition is one page long and lists the departure time for the plaintiff for a total of eight instances. The cited portion of the Kap deposition (48:14-20) provides as follows:

Q. Does the club keep any records of what time dancers arrive for a shift?

A. I believe they write it on the fee sheet.

Q. Okay. Who creates the fee sheet on a night, a given night?

A. House mom.

The defendant conveniently omitted page 49 of the Kap deposition, which reveals that the fee sheets are only kept for a week before they are shredded, a practice that has apparently continued despite the pendency of this litigation:[10]

Q. How long do you keep fee sheets?

A. A week.

Q. And then you shred them?

A. Correct.

Q. Have you been doing that since this litigation began?

A. I've been doing it 17 years.

(Kap Dep. 49:2-8, ECF No. 79-6.)

It is troubling that the defendant would represent to this Court that it complied with a requirement that its records "accurately reflect the number of hours worked by the employee" with a citation to testimony that records of start times were created, while omitting the obviously significant fact that the same records were routinely destroyed a

---

[10] The destruction of these records helps to explain why the defendant has not been able to produce time records to disprove the plaintiff's contention that she worked overtime some weeks.

week later.[11]  Thus, even if the letter were entitled to the weight the defendant alleges, the defendant would not be entitled to rely on it because it has not complied with the record keeping requirements the letter prescribes.

Furthermore, as discussed in the Background section of this Order, the defendant has not submitted any records or other evidence to show that it actually did take the service charges into its gross receipts.  As this Court's discussion in *Degidio* makes clear, what matters is not just whether the defendant recorded the amount of money received in service charges, but whether that money was treated as having been received by the Club for accounting purposes, tax purposes, etc.  *See Hart*, 967 F. Supp. at 929-30 ("Requiring that service charges pass through the employer's gross receipts guarantees that the employer takes responsibility for its employees' wages, and effectively guarantees that such mandatory deductions are taken.  By contrast, where customers pay employees directly, and the employer is left out of the payment process, there is no assurance that such deductions will be taken.")[12]  Accordingly, the Court rejects the defendant's arguments that a letter received by a separate club over twenty years ago distinguishes this case from *Degidio* or shields the defendant from liability.

### C.  <u>Class Certification</u>

All of the defendant's arguments in opposition to the motion for conditional class certification are thoroughly addressed by *Degidio*, and the defendant's motion for reconsideration does not identify any flaw in the Court's analysis or direct the Court to

---

[11] Were this not bad enough, the Court is at a complete loss to understand why the defendant continued to destroy these obviously relevant records after this litigation was filed.

[12] The Court's *Degidio* order also thoroughly distinguished *Doe v. Cin–Lan, Inc.,* 2010 WL 726710 (E.D.Mich. February 24, 2010), noting that, in *Doe*, the defendant had prevailed on a motion to dismiss a counterclaim in part by submitting sample receipts for the service charges.  *See Degidio*, 4:13-CV-02136-BHH, 2015 WL 5834280, at *17-18; *Doe*, 2010 WL 726710, at *6.

any factual distinctions between the two cases that are material to class certification under 216(b). *Degidio* thoroughly sets forth the relevant standard of review and specifically rejects several arguments that the defendant has advanced in this case. The Court adopts by reference sections II(A) and II(C)(i-iii) of the *Degidio* order, which are directly applicable to this case.

The evidence in the record is more than sufficient to establish that the defendant treated all of its entertainers in a common or similar manner. They are all classified as independent contractors. None of them are paid wages. They are all subject to the same requirements regarding house fees. They are all subject to the same written rules. In short, the defendant has a paradigm for how it does business, and that paradigm does not appear to vary in any meaningful way with regard to individual members of the class. Moreover, the Court finds that the plaintiff satisfies the more stringent standard applicable on a motion for decertification because: 1. the putative class members work in the same employment setting, 2. the defendant treats them in a common manner as described above, and 3. the defendant has no meritorious defenses that introduce individual issues and has not directed the Court to any fairness or procedural problems that the Court finds compelling. As set forth in *Degidio*, if the defendant subsequently uncovers meaningful differences between class members on the critical issues, the defendant can bring them to the Court's attention with a motion to decertify. This should not, however, be used as an opportunity to rehash arguments that the Court has already rejected in this Order or in *Degidio*.

## CONCLUSION

The Court has written a great deal, but said very little that is new. The defendant now has a thorough statement of reasons explaining why its case is "virtually identical" to *Degidio*, which it has known from the outset, and why the same result is required in both cases. Accordingly, the Court denies the defendant's motion to reconsider (ECF No. 85). The defendant is to promptly comply with the Court's Order.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

December 3, 2015
Greenville, South Carolina